UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DUREL B., : <br> : <br> Petitioner, : <br> : <br> v. : <br> : <br> THOMAS DECKER, *et al.*, : <br> : <br> Respondents. : <br> : | Civ. No. 20-3430 (KM) <br><br><br> OPINION |

**KEVIN MCNULTY, U.S.D.J.**

## I. INTRODUCTION

Petitioner, Durel B.,[1] is an immigration detainee currently held at the Hudson County Correctional Center, in Kearny, New Jersey. He is proceeding by way of counsel with an amended Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. (DE 23.) Presently before the Court is Petitioner's Motion for an Order to Show Cause, Preliminary Injunction, and Temporary Restraining Order. (DE 24). Pursuant to Local Civil Rule 78.1, this matter is decided without oral argument. For the reasons set forth below, the Motion for an Order to Show Cause, Preliminary Injunction, and Temporary Restraining Order will be granted insofar as a Temporary Restraining Order shall be issued. This decision should not be taken as signifying a result in any other individual case; rather, it is a reflection of the unique circumstances present in this particular case.

---

[1] Consistent with guidance regarding privacy concerns in social security and immigration cases by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Petitioner is identified herein only by his first name and last initial.

## II. BACKGROUND

### A. COVID-19

The United States is currently experiencing a global pandemic due to a rapidly spreading infectious disease known as COVID-19. When the World Health Organization first classified COVID-19 as a global pandemic on March 11, 2020, there were around 1,215 reported cases of the virus in the United States. *See* Ctrs. for Disease Control and Prevention, *Cases in U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Apr. 20, 2020). As of the date of this opinion, less than two months later, there are over 746,600 reported cases of COVID-19 in the United States and more than 39,000 people have died as a result. *See id.* These numbers currently continue to increase exponentially each day. *See id.* Currently, New York and New Jersey are two of the states most impacted by the virus, with more than 238,000 and 85,000 cases respectively. *See id.* As of April 13, 2020, Respondents indicate that at Hudson County Correctional Center ("HCCC"), where Petitioner is detained, eight immigration detainees have tested positive for COVID-19, 24 county and federal inmates have tested positive, and 70 staff members have tested positive. (DE 30-1 at 9-10.) One member of the correctional staff, the former facilities commissary direction, and two nurses who worked at HCCC have died from complications due to COVID-19. (*Id.* at 10.)

According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 is a respiratory illness that can spread "[b]etween people who are in close contact with one another (within about 6 feet)" and from contact with contaminated surfaces. *See* Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 20, 2020). The CDC states that "[t]he virus that causes COVID-19 is spreading very easily and sustainably between people." *See id.* Even

those who do not show symptoms of the virus may be able to spread it. *See id.* Common symptoms of COVID-19 include a fever, cough, and shortness of breath. *See* Ctrs. for Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited Apr. 20, 2020). Certain groups of individuals are at "higher risk for severe illness from COVID-19." *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 20, 2020). These "high risk" individuals include, but are not limited to, those who are over 65 years of age, have asthma, or are immunocompromised. *See id.* In order to prevent the spread of the virus, the CDC recommends "social distancing" (staying at least six feet away from others), wearing cloth face coverings when in public, regular disinfection of "frequently touched surfaces," and washing hands often with soap and water, among other practices. *See* Ctrs. for Disease Control and Prevention, *Prevent Getting Sick*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/disinfecting-your-home.html (last visited Apr. 20, 2020). Ultimately, however, "[t]he best way to prevent illness is to avoid being exposed to this virus." *See id.*

According to the CDC, correctional and detention facilities present "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments[.]" *See* Ctrs. for Disease Control and Prevention, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Apr. 20, 2020). This close proximity heightens the potential that COVID-19 will spread. *See id.* Moreover, the "ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent handwashing) may be limited and is determined by the supplies provided in the facility

and by security considerations." *See id.* The stark reality is that "avoiding exposure to COVID-19 is impossible for most detainees and inmates." *Cristian A.R. v. Thomas Decker, et al.,* Civ. No. 20-3600, ECF No. 26 at *3 (D.N.J. Apr. 12, 2020). It is against this backdrop that Petitioner filed the instant action.

**B. Factual and Procedural Background of Petitioner's Case**

*i. Procedural History and Criminal Background*

Petitioner is a 23-year-old native and citizen of Belize. (DE 27-6 at 3.) He arrived in the United States on or about July 22, 2003, at the age of six, pursuant to a temporary B2 visa, commonly referred to as a tourist visa. (*Id.*) The visa authorized Petitioner to remain in the United States until January 21, 2004. (*Id.*) Petitioner does not appear to have left the United States since his arrival in 2003.

On July 8, 2016, Petitioner was arrested and subsequently charged with kidnapping, sex trafficking, promoting prostitution, criminal sexual act, assault, unlawful imprisonment, criminal obstruction of bread or blood circulation, and petit larceny. (DE 27-6 at 12-13.) He was remanded without bail for approximately two years. (DE 27 at 14; DE 27-7 at 22.) While in jail awaiting trial, Petitioner was charged with, and pleaded guilty to, attempted assault. (DE 27-6 at 13.) It appears that he was released from pre-trial detention in the summer of 2018. (DE 27-7 at 22.) Petitioner was eventually found guilty by a jury of promoting prostitution and two counts of criminal obstruction of breathing. (DE 27-10 at 34.)

On September 6, 2018, Petitioner was served with a Notice to Appear ("NTA") charging him with removability for remaining in the United States for longer than permitted and placing him into removal proceedings. (DE 27-5 at 3.) He was taken into custody by the Department of Homeland Security ("DHS"). (DE 27 at 14.) On January 17, 2019, Petitioner appeared before an

Immigration Judge ("IJ") and denied the removability charge against him. (DE 27-8 at 3.) He also moved to terminate his removal proceedings. (*Id.* at 3-4.) The IJ denied Petitioner's request. (*Id.*) In the spring of 2019, Petitioner filed an application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), as well as an application to adjust his status. (*Id.* at 4.) On October 17, 2019, the IJ denied his applications and ordered him removed. (*Id.* at 21-22.) The BIA dismissed Petitioner's appeal of the IJ's decision, and he is now subject to a final order of removal. (DE 29 at 23.) Petitioner has not indicated whether he has appealed this decision to the United States Court of Appeals for the Second Circuit. (*Id.*) Petitioner is detained pursuant to 8 U.S.C. § 1231(a). (*Id.*)

On March 20, 2020, Petitioner filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 in the Southern District of New York. (DE 1.) On March 31, 2020, the case was transferred to the District of New Jersey and assigned to this Court. (DE 15.) Petitioner filed an amended habeas petition on April 8, 2020, as well as a Motion for an Order to Show Cause, Preliminary Injunction, and Temporary Restraining Order the following day. (DE 23, 24.) On April 13, 2020, Respondents filed their opposition to the petition and the motion. (DE 27.) Petitioner thereafter filed a reply. (DE 29.) Both parties also submitted supplemental filings. (DE 30, 31.)

   ii. *Pre-Existing Medical Conditions*

Petitioner states that he suffers from Posttraumatic Stress Disorder ("PTSD") and Unspecified Schizophrenia Spectrum and Other Psychotic Disorder. (DE 23 at 25.) He alleges that the antipsychotic medication he takes he takes for his medical conditions is "associated with decreased immunity." (DE 24 at 10.) Petitioner cites articles which indicate that antipsychotic medications have been linked with suppressing an individual's immune system, making it more difficult for their bodies to fight off infection. (DE 23 at 26.) He also cites an article which suggests

that individuals who suffer from severe mental illness such as schizophrenia are more likely to suffer complications from respiratory diseases. (*Id.*)

Moreover, Petitioner also submitted an expert declaration which states that individuals with severe and persistent mental illness ("SPMI") are significantly impacted by pandemics "because of the disruption caused to the psychiatric medication supply chain, the decreased availability of specialist providers, an increase in anxiety and stress in individuals around them, and a tendency for large scale crisis to exacerbate persecutory and grandiose illusions." (DE 24 at 9; DE 24-2.) The report further states that "threatening life events such as the COVID-19 pandemic are significantly related to the onset of psychotic or manic episodes." (DE 24 at 10; DE 24-2.)

Petitioner states that HCCC has been inconsistent in providing him with the medication required to treat his schizophrenia. (DE 23 at 25-26.) He alleges that for the first six weeks after he was transferred to HCCC in January 2020, he did not receive his antipsychotic medication. (*Id.* at 24-25.) Eventually, Petitioner was provided with his medication, however, in early March 2020, he states that he again stopped receiving his medication. (*Id.* at 25-26.) It was allegedly not until after he filed his initial habeas petition that he again began to receive his medication. (*Id.*)

### C. HCCC's COVID-19 Protocols

To describe the measures HCCC has implemented to combat the spread of COVID-19, Respondents provide the declaration of Ron Edwards, the Director of the Hudson County Department of Corrections and Rehabilitation, who oversees the HCCC. (DE 30-1.) HCCC states that there are currently no more than two detainees housed per cell. (*Id.* at 3.) Each housing unit is on a "restrictive schedule" which only permits detainees to be outside their cell for two 30-minute periods per day. (*Id.*) When detainees are outside of their cells, there is enough space for social distancing. (*Id.*) The areas outside the cells are "being cleaned continuously" and the housing units

are sanitized "no less than three times per day." (*Id.* at 3-4.) Meals are provided inside the housing unit or cells, and detainees are not allowed to congregate for meals. (*Id.* at 5.) HCCC has provided disinfectant spray and soap in every housing unit at the jail. (*Id.*) Detainees are provided two bars of soap each, and they may request additional soap as well as disinfectant wipes from staff. (*Id.* at 4, 9.)

HCCC has stopped accepting detainees who have been in China, Italy, or Iran within the last 31 days, as well as any individual who was arrested at the border or within the United States but has not been tested for COVID-19 and medically cleared. (*Id.* at 4.) Any staff members, vendors, or visitors are subject to medical screenings each time they enter the facility. (*Id.* at 6.) All staff have Personal Protective Equipment and nurses also have gowns. (*Id.* at 7.) HCCC has increased medical staffing to provide full coverage 24/7 for detainees' medical needs. (*Id.* at 2.) Medical personnel visit each cell twice a day to check on the medical and mental health status of each detainee. (*Id.* at 7.)

Detainees who complain of illness are immediately evaluated by medical personnel. (*Id.* at 8.) Any individual who exhibits signs or symptoms of COVID-19 is provided a surgical mask and is tested in accordance with the guidance provided by the CDC. (*Id.* at 7-8.) Symptomatic individuals and those awaiting test results are placed in quarantine and remain there for 14 days. (*Id.* at 8.) Each cell within the quarantine unit is spaced so that individuals are at least six feet apart. (*Id.*) If a detainee tests positive for COVID-19 but does not require hospitalization, he is isolated in a cell in a designated unit. (*Id.*) Detainees who have had known exposure to a person with confirmed COVID-19, but are asymptomatic, are housed together with restricted movement in a process known as "cohorting."[2] (*Id.* at 9.) If no new COVID-19 case develops within 14 days,

---

[2] The CDC defines cohorting as "the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together

cohorting is discontinued. (*Id.*) Since this unit is operating "well under capacity," there is ample room for social distancing between detainees who must be cohorted. (*Id.*)

Despite Mr. Edwards' assertions, Petitioner states that the measures taken at HCCC to combat the spread of COVID-19 are not being implemented as Respondents suggest. (DE 29 at 9.) Petitioner provides the declarations of multiple individuals who were recently released from HCCC which describe the conditions at the facility. (DE 24-3, DE 24-4, DE 24-5, DE 24-6.) The declarations indicate that HCCC staff have been slow to respond to requests for medical assistance, that social distancing is not enforced while individuals are permitted out of their cells, that sixty people share the same bathrooms with only four showers, that there is a lack of cleaning wipes or sprays to disinfect shared objects between uses, and that there is a lack of hand sanitizer and personal soap. (DE 24-3, DE 24-4, DE 24-5, DE 24-6.)

### III. LEGAL STANDARDS

#### A. Temporary Restraining Order

To obtain a temporary restraining order or a preliminary injunction, a petitioner must provide a "threshold" showing of two critical factors: (1) a likelihood of success on the merits of his claim; and (2) that he is "more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). A likelihood of success on the merits requires "a showing significantly better than negligible but not necessarily more likely than not." *See id.* Additionally, "[h]ow strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* at 178 (quoting

---

as a group." *See* Ctrs. for Disease Control and Prevention, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Apr. 20, 2020).

*Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)). If these two "gateway factors" are met, then the Court considers the remaining two factors which aim to balance the equities of the parties: "the possibility of harm to other interested persons from the grant or denial of the injunction," and "the public interest." *Id.* at 176 (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)). The Court considers, "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

### B. "Extraordinary Circumstances" Test for Bail

In the United States Court of Appeals for the Third Circuit's decision in *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986), the Court held that a petitioner may be eligible for bail prior to ruling on the merits of his petition under "extraordinary circumstances." *See id.* at 367. The Court held that this standard reflected "the recognition that a preliminary grant of bail is an exceptional form of relief in a habeas corpus proceeding." *See id.* The Court cited as an example of extraordinary circumstances its prior decision in *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955), where a petitioner who was "gravely ill" and required hospitalization was granted bail pending his habeas petition. *See id.* The Third Circuit in *Lucas* expressly clarified that a petitioner's poor health was not the only "extraordinary circumstance" that would justify a grant of bail. The Third Circuit reaffirmed this "extraordinary circumstance" test in its later opinions in *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) and *In re Souels*, 688 F. App'x 134, 135-36 (3d Cir. 2017). Most recently, this same "extraordinary circumstances" standard has been utilized by other courts within this district in addressing whether to grant bail to immigration habeas petitioners seeking relief during the COVID-19 pandemic. *See Cristian A.R.,* Civ. No. 20-3600, ECF No. 26 at *16; *Rafael L.O.*, Civ. No. 20-3481, 2020 WL 1808843, at *5 (D.N.J. Apr. 9, 2020).

## IV. DISCUSSION

Petitioner raises two claims for relief in his habeas petition: (1) that the conditions of his confinement amount to punishment; and (2) that Respondents are unable to provide him with adequate medical care. (DE 23 at 36-37.) Petitioner alleges that these due process violations warrant his immediate release from custody. (*Id.* at 37-38.) Under the unique set of circumstances presented in this case, I find that Petitioner has met the standard for a TRO, as well as the extraordinary circumstances justifying bail.

### A. Temporary Restraining Order

#### i. *Likelihood of Success on the Merits*

##### a. Conditions of Confinement Claim

Petitioner argues that the Due Process Clause guarantees immigration detainees the right to free from punitive conditions of confinement, but the circumstances under which he is currently being detained violates that guarantee. (DE 23 at 36.) Petitioner states that his inability to protect himself from COVID-19 while detained at HCCC, given his underlying medical conditions, is tantamount to punishment. (*Id.*) Respondents submit that not only is Petitioner's conditions of confinement claim not cognizable in a habeas petition, but also that the conditions at HCCC do not amount to punishment given the preventative measures the facility has undertaken to combat the infectious disease. (DE 27 at 21.)[3]

---

[3] Additionally, Respondents contend that Petitioner is lawfully detained, that he has not exhausted his administrative appeal by requesting a bond hearing, and that he does not have a due process right to the discretionary grant of parole. (DE 18-20.) However, Petitioner here is raising a due process challenge to the *conditions* of his confinement and not a challenge to the government's authority to detain him. The fact that Petitioner is subject to detention under § 1231(a) does not negate his argument that the conditions of his confinement may be unconstitutional. *See E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019) (holding that immigration detainees are entitled to the same due process protections as pretrial detainees and delineating the applicable legal standard for a detainee's conditions of confinement claim).

With respect to whether Petitioner's claim is cognizable in a habeas petition, the Supreme Court has "left open the question whether [detainees] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017); *see also Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."). Federal courts, however, have seemingly condoned challenges to conditions of confinement raised through a habeas petition. *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242-44 (3d Cir. 2005); *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978). Furthermore, under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that this custody violates the constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). Accordingly, I find the caselaw indicates that an immigration detainee may raise a conditions of confinement claim in his § 2241.

Regarding the merits of Petitioner's conditions of confinement claim, unlike convicted prisoners whose condition claims arise under the Eighth Amendment, pretrial and immigration detainees are entitled to heightened protections. *See Bell v. Wolfish*, 441 U.S. at 535-36; *see also Sharkey*, 928 F.3d at 306-07. Accordingly, an immigration detainee's conditions of confinement claim is properly analyzed under the Due Process Clause of the Fifth (or Fourteenth) Amendment. *See Sharkey*, 928 F.3d at 307. Under that clause, "a detainee may not be punished prior to an adjudication of guilt." *See id.* In order to determine whether a challenged condition amounts to

punishment, a court looks at whether that condition "is reasonably related to a legitimate government objective." *Sharkey*, 928 F.3d at 307. If it is not, then a court may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees." *Id.* (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).

Whether a condition of confinement is reasonably related to a legitimate government objective turns on whether the condition serves a legitimate purpose and is rationally related to that purpose. *See Hubbard*, 538 F.3d at 232. A petitioner can demonstrate that a challenged condition amounts to punishment if there is "an expressed intent to punish on the part of detention facility officials," if there is no "alternative purpose to which [the condition of confinement] may rationally be connected is assignable for it," *or* if the condition is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).[4]

---

[4] In support of his claim, Petitioner relies on the Supreme Court's decision in *Helling v. McKinney*, 509 U.S. 25 (1993). In *Helling*, the Court found that a prisoner successfully asserted a conditions of confinement claim based upon exposure to environmental tobacco smoke, despite the fact that he was asymptomatic, because the Eighth Amendment protected against "sufficiently imminent dangers[.]" *See id.* at 34-35. The Court determined that the Eighth Amendment requires individuals be provided with basic human needs, which includes "reasonable safety," and that it would be "cruel and unusual punishment to hold convicted criminals in unsafe conditions." *See id.* at 33 (internal quotation marks and citation omitted). *Helling* recognized that inmates are entitled to relief where they prove risk of exposure to serious contagious illnesses.

> We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year. In *Hutto v. Finney,* 437 U.S. 678, 682, 98 S.Ct. 2565, 2569, 57 L.Ed.2d 522 (1978), we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease. This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed. We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking

12

This inquiry has recently been addressed within the context of the current COVID-19 pandemic. In *Thakker v. Doll*, Civ. No. 20-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020), the Court found that although the government had a legitimate objective in "preventing detained aliens from absconding and ensuring that they appear for removal proceedings," the "unsanitary conditions" and "high risk of COVID-19 transmission" were not rationally related to that objective. *See id.* at *8. The Court explained that "[s]ocial distancing and proper hygiene are the *only* effective means by which we can stop the spread of COVID-19" and that the petitioners had shown that, "despite their best efforts, they cannot practice these effective preventative measures in the Facilities." *See id.* The Court found Respondent's legitimate governmental objective was weakened in particular by the other options ICE had to monitor detainees that did not require their confinement. *See id.*

Similarly, in *Rafael L.O.*, the Court concluded that Respondents had a legitimate governmental objective in preventing detainees from absconding, but that the conditions of the prison, the current global pandemic, and the medical vulnerabilities the petitioners suffered from, resulted in conditions of confinement that were tantamount to punishment. *See Rafael L.O.*, 2020 WL 1808843, at *7-8. The Court found that, "Respondents [did not] have an express intent to punish Petitioners," but that "such intent is not a necessary prerequisite." *See id.* at *7.

---

> water without waiting for an attack of dysentery. Nor can we hold
> that prison officials may be deliberately indifferent to the exposure
> of inmates to a serious, communicable disease on the ground that
> the complaining inmate shows no serious current symptoms.

*Id.* at 33.

While *Helling* supports Petitioner's proposition that exposure to an infectious disease may constitute an unconstitutional condition of confinement, it is important to note that this case does not provide the appropriate legal standard for an immigration detainee's conditions of confinement claim. *See Cristian A.R.*, Civ. No. 20-3600, ECF No. 26 at *20. The appropriate legal standard is whether the challenged condition amounts to punishment. *See Sharkey*, 928 F.3d at 307.

13

Most recently, in *Cristian A.R.*, which dealt with detainees who were also confined at HCCC, the Court held that the totality of the circumstances compelled a finding that the conditions of confinement amounted to punishment. *See Cristian A.R.*, Civ. No. 20-3600, ECF No. 26 at *21. Although the Court found that the protocols Respondents implemented to prevent the spread of COVID-19 were "laudable," the Court ultimately determined that these enhanced measures were insufficient. *See id.* at *22. In describing the inadequacies of the facilities enhanced measures, the Court stated, in pertinent part:

> Petitioners spend 23.5 hours a day in cramped cells that they have to share with another person and the remaining thirty minutes out of their cells in common areas. It is during those thirty minutes that the detainees are at high risk for COVID-19 exposure and transmission. That brief period is the only time they have each day to take showers, make telephone calls to family members and attorneys, visit the commissary, and use recreation areas. Coming into close contact with frequently used items and shared spaces is unavoidable. Respondents do not state the Facilities clean and sanitize the common areas and frequently-touched common items in-between each period during which new detainees and inmates leave their cells. Instead, they provide that cleaning occurs at least three or four times per day. *See* Ahrendt Decl. ¶ 9.K; Edwards Decl. ¶¶ 11, 12.E. Accordingly, even crediting the Facilities' increased efforts to clean and disinfect shared spaces, Respondents cannot dispute that many, if not all, detainees use the common areas and objects in-between cleanings and are being exposed to potentially contaminated surfaces. Detainees also report that corrections officers' and medical staff's use of gloves and masks is inconsistent and certainly not in line with the CDC's recommendations, further compounding their risk of exposure. *See* Arcia-Quijano Decl. ¶ 5; Gordillo Decl. ¶ 11; Durkin Decl. ¶ 9.
>
> To make matters worse, detainees who want to do their part in curtailing the spread of COVID-19 to themselves and others are not provided the resources to do so. Detainees are forced to share soap or have no soap at all, *see, e.g.*, Eisenzweig Decl. ¶ 8, and lack other basic hygiene items like hand sanitizer. Respondents do not indicate whether and how often soap or other hygiene products are provided to detainees. That means, when they return to their cells to begin their next 23.5-hour period of confinement, detainees are unable to perform the most effective measure of combatting the spread of the

> virus: washing and disinfecting their hands. Showering is not an option because their only access to showers is during their brief half-hour recreational period. Covering their faces with masks or hands with gloves is also not possible, unless they have already shown signs of COVID-19, but by that time, avoiding infection is likely too late. *See* Ahrendt Decl. ¶ 9.G.; Edwards ¶ 14.

*Id.* at *22-24.

Guided by the decisions in *Thakker*, *Rafael L.O.*, and *Cristian A.R.*, I find that the circumstances presented here amount to punishment. While Respondents have undertaken significant measures to try and prevent COVID-19 from further spreading throughout the facility, those measures appear insufficient to protect Petitioner whose allegedly compromised immune system puts him at greater risk of severe illness if he were to contract COVID-19. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 20, 2020). Petitioner alleges an inability to adhere CDC guidance on how to protect himself from contracting COVID-19, such as practicing social distancing, using hand sanitizer, and washing his hands regularly. (DE 23 at 36.)

Respondents argue, however, that they do not have an express intent to punish Petitioner. (DE 27 at 21.) Indeed, I do not find that Respondents have such an express intent. However, such a finding is not required in order to conclude that conditions of confinement may amount to punishment. *See Bell*, 441 U.S. at 538; *see also Rafael L.O.*, 2020 WL 1808843, at *7. Respondents also argue that they have a legitimate government interest ensuring Petitioner does not abscond and appears for his removal proceedings. (DE 27 at 21-22.) However, given the current pandemic and Petitioner's compromised immune system, I find that the conditions of Petitioner's confinement are excessive in relation to Respondents' purpose. This especially true given the existence of the available alternatives to Petitioner's confinement. *See Thakker*, 2020 WL

1671563, at *8. Accordingly, I find that Petitioner has shown a likelihood of success on the merits on his conditions of confinement claim.

### b. Deliberate Indifference Claim

Petitioner's second due process claim alleges that Respondents have demonstrated deliberate indifference towards his serious medical needs by "failing to adequately protect" him and by "not [taking the] necessary or appropriate precautions." (DE 23 at 37.) Respondents argue that an inadequate medical care claim is not cognizable in a habeas petition, but that even if it was, they have not demonstrated the requisite deliberate indifference. (DE 27 at 25-27.) Even assuming that Petitioner could raise an inadequate medical care claim in a § 2241, I find that Petitioner has not shown a likelihood of success on the merits of this claim.

The applicable legal standard for an immigration detainee's inadequate medical care claim is that of deliberate indifference. *See Harvey v. Chertoff*, 263 F. App'x 188, 191 (3d Cir. 2008) (citing *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581-85 (3d Cir. 2003)); *see also Camacho Lopez v. Lowe*, Civ. No. 3:20-CV-563, 2020 WL 1689874, at *7 (M.D. Pa. Apr. 7, 2020). Thus, to succeed on a claim of inadequate medical care, a petitioner must show: (1) "a serious medical need," and (2) "acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale*, 318 F.3d at 582. "To act with deliberate indifference to serious medical needs, is to recklessly disregard a substantial risk of serious harm." *Harvey*, 263 F. App'x at 191 (citing *Estelle v. Gamble*, 429 U.S. 97, 105-05 (1976) and *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). The Third Circuit has found deliberate indifference in situations where: "(1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, and (4) prison authorities prevent an inmate from receiving

recommended treatment for serious medical needs." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 538 (3d Cir. 2017).

Here, in recognizing the grave risk that COVID-19 presents, Respondents have undertaken numerous measures in order to combat the spread COVID-19 and prevent detainees from contracting the illness. Respondents have implemented significant steps to comply with the CDC's guidelines for Correctional and Detention facilities, including increased cleaning of their facility, increased monitoring of detainees' medical health, and the imposition of social distancing protocols. These actions do not demonstrate that prison officials have recklessly disregarded the substantial risk of harm that COVID-19 poses. Rather, these actions indicate that Respondents are actively trying to prevent detainees from contracting COVID-19. While there may not yet be a perfect solution to preventing the spread of this infectious disease, Respondents' conduct simply does not demonstrate a deliberate indifference to the current global pandemic. Accordingly, Petitioner has not shown a likelihood of success on the merits of his deliberate indifference claim.

Although Petitioner has not shown a likelihood of success on the merits of his deliberate indifference claim, he has demonstrated a likelihood of success on his conditions of confinement claim. Therefore, I find that Petitioner has met the first factor required for the grant of a TRO.

  *ii.*  *Irreparable Harm*

The second threshold showing Petitioner must make in order to be granted a TRO is that he is "more likely than not" to suffer irreparable harm absent the relief requested. *See Reilly*, 858 F.3d at 179. Respondents argue that Petitioner has not articulated irreparable harm that would warrant immediate release since he has not alleged exposure to an individual with confirmed COVID-19 or even an individual who is symptomatic. (DE 27 at 30-31.)

17

While there is currently no guarantee against contracting COVID-19, correctional and detention facilities present "unique challenges for control of COVID-19 transmission[.]" *See* Ctrs. for Disease Control and Prevention, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Apr. 20, 2020). Within facilities such as HCCC, detainees "cannot practically adhere to social distancing guidelines or the adequate level of personal hygiene," measures which have been "touted as the most effective means to thwart the spread of the virus." *See Cristian A.R.,* Civ. No. 20-3600, ECF No. 26 at *25-26 (quoting *Rafael L.O.*, 2020 WL 1808843, at *8). The number of cases in HCCC alone underscores this point. (DE 32 at 20-21.) Additionally, although Petitioner may not have alleged exposure to a symptomatic individual, the CDC reports that COVID-19 can still be spread even by those who are asymptomatic. *See* Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 20, 2020). Given Petitioner's compromised immune system, he remains particularly vulnerable to developing severe illness if he contracts COVID-19. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 20, 2020). Thus, it is apparent that Petitioner is more likely than not to suffer irreparable harm if his confinement at HCCC continues.

>   *iii.   Balancing of the Equities*

I next consider the remaining two factors: the possibility of harm to other interested persons from the grant or denial of the injunction and the public interest. For the reasons explained above, there remains a significant possibility of harm to Petitioner if he remains detained at HCCC.

Petitioner states that the antipsychotic medication he takes compromises his immune system, thereby placing him at greater risk of developing severe illness as a result of COVD-19. It is also in the public interest to release Petitioner before he contracts COVID-19 in order to "preserve critical medical resources and prevent further stress on the states' and country's already overburdened healthcare systems." *See Cristian A.R.*, Civ. No. 20-3600, ECF No. 26 at *27.

I recognize that Respondents have a legitimate interest in ensuring Petitioner does not abscond and in protecting the public, especially given Petitioner's criminal history and the fact that he is subject to detention pursuant to 8 U.S.C. § 1231(a). However, Petitioner has significant ties to the United States. He has been in this country since he was six years old. The majority of his family lives in the United States. (DE 23 at 25.) Petitioner states that, if released, he will reside with his aunt, where he will have his own room, and he will continue to work closely with his assigned social worker to maintain his medication regime. (DE 29 at 28.)

Given all of these considerations, I believe that Respondents' interests and Petitioner's interests can be appropriately addressed by releasing Petitioner to strict conditions including home confinement, as well as electronic and telephonic monitoring. The specific conditions of his release are set forth in the Order accompanying this Opinion. Thus, in balancing each of these factors, I find that they favor the grant of a TRO to the following extent.

### B. Extraordinary Circumstances Warranting Bail

The United States is the midst of a global pandemic and Petitioner is currently detained in a facility which is "at the epicenter of the outbreak" in the United States. *See Cristian A.R.,* Civ. No. 20-3600, ECF No. 26 at *28. Petitioner allegedly suffers from a compromised immune system, which has been identified by the CDC as worsening the risk of severe illness from COVID-19. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*,

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 20, 2020). The risk to Petitioner's health is grave. Accordingly, I find that these facts constitute extraordinary circumstances which warrant release on bail.

## V. CONCLUSION

For the foregoing reasons, Petitioner's Motion for an Order to Show Cause, Preliminary Injunction, and Temporary Restraining Order (DE 30) will be granted insofar as a Temporary Restraining Order shall be issued. An appropriate Order accompanies this Opinion.

DATED: April 21, 2020

/s/ Kevin McNulty
_____
KEVIN MCNULTY
United States District Judge